FERNANDEZ, J.
Marine Resources Development Foundation, Inc., etc. (“Foundation”), appeals the trial court’s entry of final summary judgment in favor of appellees Moore & Company, P.A. (“Firm”), Michael Moore, Esq. (“Moore”), and Erin Ackor, Esq. (“Ackor”) (collectively, “defendants”) involving claims for professional negligence. We reverse the final summary judgment because genuine issues of material fact exist regarding the sufficiency and clarity of the Firm’s legal advice to the Foundation, and whether its advice affected the Foundation’s decision to continue construction of the subject vessel.
This case arises out of the Firm’s representation of the Foundation, a non-profit entity engaged in marine education and research. Under its “donated boats program,” the Foundation raises funds by acquiring boats for below market-value, and then restores/repairs them and resells them for a profit. At the center of this dispute is a 120-foot, 1988 model aluminum yacht, the “Cajun Princess,” which the Foundation purchased in May of 2004. The Foundation received an initial loan for $4.5 million to cover the costs of purchase, restoration, and other fees from David Bo-gle, a private investor. The Foundation initially planned to refurbish the yacht so it could be sold for an estimated $7-9 million on the open market.
Plans for the project changed when, during the course of refurbishment, the marine architect employed by the Foundation discovered extensive corrosion on the boat’s superstructure.[1] The Foundation then decided to rebuild the yacht to a more modern tri-deck configuration, which resulted in higher projected costs.
Another change in plans occurred after the yacht lost its coastwise privileges in the United States because it was flagged *1074 as a foreign vessel.[2] Consequently, the architect advised the Foundation that it would be more prudent to deconstruct and re-build the boat instead, and then pursue a new build determination (“NBD”)[3] from the Naval Vessel Documentation Center (“NVDC”). This would nearly double the Foundation’s projected costs, but would substantially increase its value, which would allow the vessel to potentially be sold for up to $18 million.
Acting on this recommendation, the Foundation retained the Firm to obtain coastwise privileges for the yacht. Ackor, who was an associate at the Firm, worked with Moore, the Firm’s managing partner, on the file. The Firm, at the Foundation’s request, pursued a NBD to obtain the coastwise privileges. Ackor e-mailed the governing statute, 46 C.F.R. § 67.3 (2005), which states the standard for obtaining a NBD,[4] to Rick Pineiro, the Vice President of the Foundation. Under the standard followed by NVDC when it grants “new vessel” status — which is notoriously difficult to meet — a “new vessel” is one which:
1) The hull and superstructure of which are constructed entirely of new materials; or
2) Which is constructed using structural parts of an existing vessel, which parts have been torn down so that they are no longer advanced to a degree which would commit them to use in the building of a vessel.
See 46 C.F.R. § 67.3 (2005) (emphasis added).
In her e-mail, Ackor also informed Pi-neiro that the Coast Guard’s “primary concern and critical factor when reviewing the applications [for NBD] is the extent to which the vessel was torn down to mere parts and then rebuilt.” Finally, it listed the documentation required to prove compliance with the statute and to be submitted with the NBD application.
Ackor sent the NBD application and documents to the NVDC. The Foundation included in its application a written statement and inboard profile that described the extent to which materials from the existing vessel were used in the construction, along with a sketch that identified, where practicable, the components of the old vessel. In other words, the Foundation’s written statement and inboard profile listed certain parts of the vessel that had not been completely torn down but rather re-used with extensive local repair.
The NVDC thereafter informed the Firm that the submission would not meet the definition of “new vessel” under 46 C.F.R. § 67.3. Ackor discussed the problems with the NBD application with Pinei-ro. Ackor also sent an email in which she requested more detailed reports and photos of the yacht so that further action could be taken on the NBD application. Pineiro testified that the Firm had a “very positive approach to the whole thing” with regard to whether a NBD would ultimately be obtained.
The Foundation held a board meeting in January of 2006 to decide whether to end *1075 the rebuilding of the yacht or continue with the project. Pineiro, based on his belief that a NBD certification would be forthcoming, told the Board that the vessel was going to be “newly titled” and would, therefore, be more valuable if the Foundation completed the rebuild. Nevertheless, the Foundation requested that Pineiro cease work on the boat. Thereafter, Pinei-ro and Ron Hertel, a private investor, entered into a contract for Hertel to buy the yacht. Pineiro also secured an investment from Hertel in order to continue the yacht rebuild according to the new contract’s specifications. However, Hertel ultimately decided not to close on the contract, partly because he learned that the Cajun Princess was not a new vessel.
On November 20, 2006, Ackor sent a formal application for a NBD to the NVDC. However, the application was rejected in December of 2006. The NVDC noted that while the vessel did undergo substantial modifications, some parts of the boat’s hull were still intact and never torn down, and was therefore not “new” under § 67.3. The Firm subsequently met with the Foundation to review future options to obtain coastwise privileges. On January 5, 2007, the Firm appealed the NVDC’s denial of the NBD. The Foundation thereafter terminated the Firm.
Rear Admiral James A. Watson denied the appeal for the NBD on behalf of the NVDC in March of 2009. After the NBD denial, Bogle foreclosed the mortgage he held on the yacht and obtained a judgment against the Foundation. Bogle subsequently became the successful bidder and took possession of the yacht.
The Foundation subsequently filed a lawsuit against defendants for professional negligence, seeking economic damages in the form of profits it would have earned from the sale of the yacht had the NBD been obtained. Defendants moved for final summary judgment. The trial court denied defendants’ motion, stating that factual issues remained. Defendants then filed a motion for rehearing and reconsideration. The court ultimately reversed its prior ruling and entered final summary judgment in favor of defendants.
We agree with the Foundation that the trial court erred when it granted final summary judgment in favor of defendants, as there were genuine issues of material fact as to whether defendants were negligent in their representation of the Foundation. Summary judgment is proper only if no genuine issue of material fact exists and if the moving party is entitled to a judgment as a matter of law. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). The standard of review for summary judgment is de novo. Id. In reviewing a summary judgment, this Court “must consider the evidence contained in the record, including any supporting affidavits, in the light most favorable to the non-moving party ... and if the slightest doubt exists, the summary judgment must be reversed.” Daneri v. BCRE Brickell, LLC, 79-So.3d 91, 93-94 (Fla. 3d DCA 2012).
“In any legal malpractice suit, the plaintiff is required to plead and prove ‘(1) the attorney’s employment; (2) the attorney’s neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the plaintiff.’” Riccio v. Stein, 559 So.2d 1207, 1208 (Fla. 3d DCA 1990). The first factor is not in dispute, as defendants conceded at the summary judgment hearing that the Foundation employed them. However, the second and third factors have not been satisfied.
There is a genuine issue of material fact as to whether the attorney neglected a reasonable duty. During the proceedings, *1076 the Firm argued that it satisfied its duty-owed to the Foundation when it advised it of problems with the NBD application and made it aware of the problems at all times material. Further, it urged that it was not the proximate cause of the Foundation’s loss because the Foundation suffered no damages. Alternatively, if there were damages, the Firm argues then they were incurred as a result of the Foundation’s own reckless decisions.
However, these actions do not resolve the “genuine issue of material fact as to whether the attorney’s conduct fulfilled the requisite standard of care.” Daytona Dev. Corp. v. McFarland, 505 So.2d 464, 467 (Fla. 2d DCA 1987). In Shear v. Hornsby & Whisenand, P.A., 603 So.2d 129 (Fla. 3d DCA 1992), for example, summary judgment was reversed because genuine issues of material fact remained regarding whether the law firm sufficiently advised a client that he might end up being liable for opposing fees if the client pursued a mechanic’s lien. Here, Ackor admitted at her deposition that she felt no duty to provide advice to the Foundation. The Foundation alleged that it was never made aware of how stringent the NBD standard was, or the extent to which the Cajun Princess would have to be torn down and rebuilt. In addition, it asserted that the Firm’s failure to timely inform the Foundation that it would not receive a NBD caused it to increase its investment, lose its profit, and ultimately lose its entire investment to foreclosure.
Defendants never gave the Foundation any idea of how difficult it was to obtain a NBD. The record, however, reflects that they were confident that a NBD would be granted. However, if the appellees had researched the requirements to obtain a NBD, they would have then been aware of the extremely high standard required for obtaining a NBD and would have been able to advise the Foundation that the work that had been done to the Cajun Princess would not meet this standard. In researching the issue, the appellees would have come across the United States Supreme Court case of New Bedford Dry Dock Company v. Purdy (The Jack-O-Lantern), 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922). This case was cited by U.S. Coast Guard Rear Admiral James A. Watson, in his letter to Ackor, wherein he denied the appeal. Watson stated in his letter that Ackor referred to the regulatory standard, used for wrecked vessels, which is different from new vessels. New Bedford states:
‘And generally, it may be held as a principle, that, where the keel, stem, and stern posts and ribs of an old vessel, without being broken up and forming an intact frame, are built upon as a skeleton, the case is one of an old vessel rebuilt, and not of a new vessel. Indeed, without regard to the particular parts re-used, if any considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up, is built upon, the law holds that in such a case it is the old vessel rebuilt, and not a new vessel. But where no piece of the timber of an old vessel is used without being first dislocated and then replaced, where no set of timbers are left together intact in their original positions, but all the timbers are severally taken out, refitted, and then reset, there we have a very different case That is a case of a vessel rebuilt.’
Id. at 100, 42 S.Ct. 243 (citation omitted).
Admiral Watson then pointed out that the United States Supreme Court has not changed the standard for the definition of “new vessel.” Under this standard, the Foundation’s application for a NBD failed to meet the requirements for a new vessel, as 46 C.F.R. § 67.3 requires. The record *1077 thus reflects that Ackor’s understanding of the regulatory standard was incorrect. In addition, it is unclear from the record what documents Moore did or did not review. Further, if Moore conducted a review of these documents, it is also unclear at what point in time did he review them. Thus, the advice that Moore and Ackor did or did not communicate to the Foundation created genuine issues of material fact. The facts, therefore, read in the light most favorable to the Foundation do not prove that the Firm’s explanation of the regulation properly conveyed the correct standard for obtaining a NBD.
We take no position on the merits of the Foundation’s case. We only note that when the facts are considered in the light most favorable to the Foundation as the non-moving party, there remain unresolved issues of material fact. Upon a de novo review, we are unable to conclude that defendants are entitled to judgment as a matter of law. See Fla. R. Civ. P. 1.510(c); Palafrugell Holdings, Inc. v. Cassel, 940 So.2d 492, 495 (Fla. 3d DCA 2006).
Because genuine issues of fact do exist regarding (1) the sufficiency and clarity of the Firm’s legal advice to the Foundation interpreting 46 C.F.R. § 67.3, and (2) the effect of this advice on the Foundation’s decision to continue to rebuild the boat, we reverse the trial court’s final summary judgment entered in favor of defendants and remand the case to the trial court for proceedings consistent with this opinion.
Reversed and remanded.

. The "superstructure” includes all of the boat above the main deck.

.A vessel loses its coastwise privileges if it is sold in whole or in part to a non-citizen of the United States or is registered outside of the United States. Coastwise privileges would permit the Cajun Princess to engage in commercial activity between American ports and its territories. Coastwise privileges would also allow the Cajun Princess to be chartered with a new crew and to operate with passengers for hire in the United States.

. New build certification is legal certification that a ship is a "new” vessel and not a rebuilt "old” vessel. When a NBD is granted to a vessel, it automatically gives it coastwise privileges as a U.S. vessel, as opposed to restoring coastwise privileges.

. See 46 C.F.R. § 67.3 (2005).